# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI SOUTHERN DIVISION

**DARRELL LEON MCCLANAHAN III,**

Plaintiff,

v.

Case No. 6:25-cv-03399-DGK

**DENNY HOSKINS, SECRETARY OF STATE; MISSOURI REPUBLICAN STATE COMMITTEE (MRSC); and PETER KINDER, Chairman, MRSC,**

Defendants.

**JURY TRIAL DEMANDED**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF (42 U.S.C. § 1983)**

**PREAMBLE**

**I. PERMISSION vs. POWER: What Parties Can Do vs. What the Constitution Forbids**

1. Plaintiff does not contest the Missouri Republican State Committee's broad First Amendment associational rights. The MRSC remains free to:

   - Decide who speaks from its convention stages
   - Withhold donor dollars from disfavored candidates
   - Officially endorse opponents
   - Publicly disavow candidates it dislikes

1

2. These are protected private functions of political association. *California Democratic Party v. Jones*, 530 U.S. 567 (2000).

3. However, a party's right to "disavow" is not a right to "cancel/disappear" constitutionally qualified candidates from a public ballot. When Missouri delegates public ballot gatekeeping via §115.357.2 making the MRSC receipt a mandatory state prerequisite the committee becomes a state actor forbidden from imposing extra-constitutional tests.

## II. THE "BIG TENT" HYPOCRISY: Famous Switchers vs. Grassroots Delegates

4. The Republican Party celebrates "second acts" from national figures, but applies "purity tests" to local conservatives. Historically and in modern times:

   o **Donald Trump** – A five-time party switcher who has been registered as a Republican, as a member of the Reform/Independence Party, as a Democrat, as an Independent, and then again as a Republican. Despite prior donations to Democratic politicians and pro-choice positions, he was allowed to run in the 2016 Republican presidential primary without being required to complete any Values Survey, Tally Sheet, or ideological vetting to appear on the ballot.

   o **Ronald Reagan** – A New Deal Democrat who voted for Franklin Roosevelt, supported Harry Truman, and publicly campaigned for Democratic candidates before formally switching to the Republican Party in 1962. He was never subjected to a written purity test or ideological checklist before becoming the party's two-term presidential standard-bearer.

   o **Tulsi Gabbard** – Former Democratic National Committee Vice Chair and 2020 Democratic presidential candidate. After breaking with the Democratic Party and aligning with Republican leadership, she was rapidly embraced and placed in high-profile positions, including being discussed and advanced for senior national-security roles, without any public requirement that she pass a Missouri-style Values Survey or Tally Sheet to participate in Republican politics.

2

- o **Robert F. Kennedy Jr.** – Member of the Kennedy Democratic family and long-time liberal activist. When he moved into the Republican orbit and allied with Donald Trump, Republican leaders welcomed his supporters and his voice as evidence of a growing "Big Tent," rather than demanding he retroactively conform to every historic GOP platform plank through a written purity test.

- o **Jim Justice** – Elected as a Democrat as Governor of West Virginia in 2016, then switched parties at a rally with Donald Trump in 2017. He was celebrated by Republican leadership and later elected as a Republican U.S. Senator, again without any public requirement that he complete a Values Survey, score 70 percent on third-party conservative scorecards, or pass a criminal-history Tally Sheet as a condition of running.

- o **Richard Shelby** – Lifelong Southern Democrat who switched to the Republican Party the day after the 1994 "Republican Revolution." The GOP preserved his seniority and eventually made him Chair of the powerful Senate Appropriations Committee, showing that party leadership was willing to reward a high-profile convert without subjecting him to ideological vetting for ballot access.

- o **Phil Gramm** – Elected to Congress as a Democrat, punished by his own party for supporting President Reagan's budget. He resigned, joined the Republican Party, and easily won a special election to reclaim his seat as a Republican in 1983. He then became a principal architect of Republican economic policy, again without any "purity test" as a condition to appear on the ballot.

- o **Jeff Van Drew** – Lifelong Democrat and New Jersey Congressman who switched to the Republican Party in 2019 during the first impeachment of Donald Trump. Republican leadership publicly pledged "100 percent support" and campaigned for him, with no evidence of any formal ideological vetting before he ran as a Republican incumbent.

3

5. By contrast, **Plaintiff Darrell Leon McClanahan III** – A Republican Ron Paul delegate, Christian conservative, and long-time Republican activist is threatened with exclusion from the Missouri Fourth Congressional District Republican primary ballot unless he first submits to the MRSC's mandatory ideological vetting process: a Values Survey, a Candidate Tally Sheet using third-party scorecards that require 70 percent alignment, and automatic disqualification based on felony history or other "red flags."

6. This inconsistency shows that the MRSC Vetting Manual is not a neutral rule applied equally to all candidates, but a tool for viewpoint discrimination: famous converts and high-value politicians are welcomed without any purity test, while grassroots dissidents like Plaintiff are subjected to mandatory ideological vetting and threatened with ballot exclusion.

Plaintiff Darrell Leon McClanahan III, proceeding pro se, for his Complaint against Defendants, alleges as follows:

## I. INTRODUCTION

7. This is a civil rights action under 42 U.S.C. § 1983 seeking a declaration and injunction against the Defendants for their threatened violation of Plaintiff's fundamental rights to seek public office.

8. This action further seeks to protect the rights of voters and candidates to associate, and Plaintiff's rights to due process and equal protection under the First and Fourteenth Amendments to the U.S. Constitution, as well as the Qualifications Clause (Article I, Section 2).

9. Plaintiff Darrell Leon McClanahan III is an eligible candidate for U.S. Representative, Missouri's 4th Congressional District (MO-04), in the August 2026 Republican primary election.

10. Plaintiff is a longtime Republican candidate and conservative activist who has participated in party activities.

4

11. Plaintiff's participation includes serving as a Jasper County delegate for Ron Paul at the 2012 Missouri Republican State Convention, running for U.S. Senate in the 2022 Republican primary, running as a write-in candidate for U.S. House Missouri District 4 in the 2022 general election, and running for Governor in the 2024 Republican primary.

12. Plaintiff intends to file as a candidate for United States Representative, Missouri's 4th Congressional District (MO-04), in the August 2026 Republican primary election, tendering the $300 filing fee to the MRSC Treasurer on February 24, 2026.

13. This action challenges the constitutionality of Mo. Rev. Stat. § 115.357.2 as applied.

14. Mo. Rev. Stat. § 115.357.2 delegates the State's essential function of ballot certification to the private Missouri Republican State Committee (MRSC).

15. The MRSC's use of this delegated authority to implement a mandatory ideological "vetting" and "purity test" to veto candidates who meet all objective statutory qualifications constitutes state action and a severe, unconstitutional burden on the political process.

16. Relief is sought to prevent the Defendants from denying Plaintiff access to the dispositive primary ballot.

17. The denial of access is based on subjective, unwritten, and discriminatory criteria that include unconstitutional additions to federal qualifications for office.

## II. JURISDICTION, VENUE, AND PARTIES

18. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

19. This Court has civil rights jurisdiction under 28 U.S.C. § 1343(a)(3) for the deprivation of constitutional rights under color of state law.

20. Venue is proper in this district under 28 U.S.C. § 1391(b).

5

21. Plaintiff DARRELL LEON MCCLANAHAN III is a natural United States Citizen residing at 24346 S. 2425 Rd., Milo, MO 64767 in this district.

22. Plaintiff meets all age, citizenship, and residency qualifications for U.S. Representative under Article I, Section 2 of the United States Constitution.

23. Defendant DENNY HOSKINS is Missouri Secretary of State, sued in his official capacity.

24. Defendant Hoskins is responsible for the ministerial tasks of ballot certification under Mo. Rev. Stat. §§ 115.357 and 115.387.

25. Defendant MISSOURI REPUBLICAN STATE COMMITTEE (MRSC) is a political party committee that performs state-delegated election functions.

26. The MRSC performs the specific gatekeeping function of issuing a ballot access prerequisite (the filing fee receipt) under Mo. Rev. Stat. § 115.357.2, making it a state actor under § 1983.

27. Defendant PETER KINDER is MRSC Chairman (a fact publicly confirmed on the Missouri Republican Party's official website), sued in his official capacity.

28. Defendant Kinder controls the policy and implementation of the filing fee receipt process.


## III. FACTUAL BACKGROUND

### A. Plaintiff's Candidacy and Political History

29. The MO-04 Congressional District is overwhelmingly Republican (Cook PVI R+23) (as reported by the Cook Political Report with Amy Walter).

30. The Republican primary is the dispositive election, meaning the winner of the primary is the de facto winner of the general election.

31. Plaintiff has a deep and consistent history of participation in the Republican Party, demonstrating his bona fide membership and commitment to the party's principles.

6

32. This history includes serving as a Jasper County delegate for Ron Paul at the 2012 Missouri Republican State Convention.

33. Running for U.S. Senate in the 2022 Republican primary, receiving 0.2% of the vote (per certified results from the Missouri Secretary of State).

34. Declaring his candidacy with the Missouri Secretary of State and running as a write-in candidate for U.S. House Missouri District 4 in the 2022 general election.

35. Running for Governor in the 2024 Republican primary, receiving 0.8% of the vote (per certified results from the Missouri Secretary of State).

## B. Plaintiff's Broader Litigation Context and Coordinated Opposition

36. Plaintiff is a pro se civil-rights litigant who is declaring his candidacy for the 2026 MO-04 Republican congressional primary, who has built out of necessity, a dense record across linked criminal, civil, and federal cases, all turning on the denial of conflict-free counsel, manufactured indigency, and ballot-access manipulation.

37. Plaintiff is an indigent felony defendant and never being convicted of a felony.

38. Plaintiff has lived in Vernon County (Milo), Missouri since April 2021, and is married to April Miller McClanahan. Plaintiff is a lay legal researcher, was raised Catholic, suffers from dyslexia, has a 10th grade education, has six children and has been demonized for being a house mom; and uses audio readers and text tools to work.

39. Plaintiff has extensive self-taught and lay legal research-level experience and drafts his own complex writs/petitions, mandamus, §1983, and ballot-access pleadings. Plaintiff is an advocate for the fully informed jury association and unjustly incarcerated Missouri inmate Jeffrey Weinhaus.

40. In Wright/Ozark County criminal cases (22WR-CR00256 & 22WR-CR00553), which originated as a civil matter that was converted into a criminal case and which Plaintiff asserts involve false charges, Plaintiff has been kept 13+ months without conflict-free counsel while indigent, with Judge J. Ronald Carrier and Judge R. Craig Carter imposing impossible

7

conditions and manipulating bond to force Plaintiff to "retain" counsel he cannot afford.

41. The key features of these criminal cases include a coerced "agreement" to get counsel under threat of contempt and jail, with no genuine waiver of the right to public, conflict-free counsel.

42. In those cases, public defender Marsha Stiles admitted a conflict ("entire office conflicted") between the Executive and the Judiciary, and the court refused to rule properly on mandatory withdrawal.

43. Two judge recusals in those cases show recognition of structural problems, but with no structural fix.

44. In Vernon County Circuit Court, Plaintiff filed a civil rights suit against MSPD actors, clerk Lori Jones, and others for manufactured indigency, bond manipulation, and blocking filings (Case No. 25VE-CV00685, Vernon County Circuit Court).

45. In Cole County, Plaintiff is currently suing Missouri Governor Michael L. Kehoe in *McClanahan v. Kehoe*, challenging Missouri's REAL ID implementation and the constructed conflict of the Missouri State Public Defender system (Case No. 25AC-CC06707, Cole County Circuit Court).

46. In that Cole County case, the Missouri Attorney General's Office appears for Governor Kehoe while simultaneously defending the same prosecutor, public defenders, and circuit clerk involved in Plaintiff's ongoing criminal proceedings, reflecting a consolidated institutional opposition to Plaintiff across his criminal and civil litigation.

47. Plaintiff has also filed a federal case in the Western District of Missouri, *McClanahan v. Carrier, et al.*, a §1983 structural-sixth amendment right-to-counsel case against judges, the prosecutor, the clerk, and MSPD officials (Case No. 6:25-cv-03360-BCW, U.S. District Court for the Western District of Missouri).

48. The claims in that federal case include that the executive-controlled MSPD structure creates an unconstitutional structural conflict and separation-of-

8

powers problem, and that exceptions to Younger abstention apply because the same actors blocking counsel also control the forum.

49. Plaintiff is also the appellant in *McClanahan v. Trump, et al.* (W.D. Mo. Case No. 3:2025cv05025; 8th Cir. Appeal No. 25-3007), an action further demonstrating the pattern of state and federal actors seeking to chill Plaintiff's protected speech.

50. The appeal in *McClanahan v. Trump* challenges the dismissal of Plaintiff's First Amendment claims.

51. Plaintiff's lawsuit argues that the Executive Orders defining and targeting "anti-Semitism" are unconstitutional viewpoint discrimination that chills protected religious and political speech, and that Plaintiff's own speech is not anti-Semitic.

52. Plaintiff asserts that the District Judge committed reversible error by using the wrong legal standard for standing, which allowed the government to avoid addressing the constitutional merits of the case.

53. The Department of Justice waived its appeal brief in that matter, meaning Plaintiff's appeal is consequently unopposed on the merits.

54. Separately, Missouri officials, including Secretary of State Denny Hoskins and Attorney General Catherine Hanaway, are attempting to force a Trump-backed congressional gerrymander into effect despite a statewide referendum campaign that submitted over 300,000 signatures nearly triple the 107,000 required to suspend the new map under Mo. Const. art. III, § 52(a).

55. Former Missouri Supreme Court Chief Justice Mike Wolff has stated that once a referendum petition is filed with sufficient signatures "the law is suspended."

56. Former Secretary of State Jason Kander has publicly criticized Hoskins's refusal to treat the map as frozen as a break with decades of bipartisan practice.

57. In litigation brought by People Not Politicians, state courts have already recognized that the key issue is whether the signatures are certified and have

9

ordered Hoskins to preserve all signatures while the case is held in abeyance, underscoring that the validity of the referendum and thus whether the gerrymandered map can be used in 2026 is in active dispute.

58. Against this backdrop, Defendants' plan to use MRSC's extra-statutory "vetting" system and § 115.357.2 to veto Plaintiff's candidacy is part of a broader effort by state and party officials to control who may appear on the ballot and to predetermine Missouri's congressional delegation despite constitutional safeguards.

## C. The Missouri Statutory Scheme for Ballot Access

59. Mo. Rev. Stat. § 115.357.2 governs primary filing requirements for federal office: "The candidate shall pay the required sum directly to the treasurer of the appropriate party committee."

60. For the office of U.S. Representative, the required fee is $300.00, payable to the MRSC Treasurer.

61. The Secretary of State, Defendant Hoskins, is required to reject a candidate's Declaration of Candidacy if the candidate does not present a receipt showing payment of the fee to the appropriate party committee. Mo. Rev. Stat. § 115.357.2.

62. By making the party receipt a mandatory prerequisite to state filing, the statute effectively delegates the state's essential ballot access function to the MRSC.

## D. Federal Constitutional Qualifications for U.S. Representative

63. The United States Constitution, Article I, Section 2, Clause 2, establishes the exclusive qualifications for U.S. Representative: (a) at least 25 years of age; (b) a citizen of the United States for at least seven years; and (c) an inhabitant of the state in which chosen.

64. In *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995), the Supreme Court held that these constitutional qualifications are exclusive and that states cannot add qualifications for federal office through any mechanism, including ballot access restrictions.

10

65. The Court in *Thornton* emphasized that "allowing individual States to adopt their own qualifications for congressional service would be inconsistent with the Framers' vision of a uniform National Legislature representing the people of the United States."

66. In *Powell v. McCormack*, 395 U.S. 486 (1969), the Supreme Court held that even Congress itself cannot add qualifications beyond those specified in the Constitution, establishing that the Qualifications Clauses fix the sole requirements for congressional membership.

67. The State of Missouri has previously been prohibited from circumventing federal qualifications through ballot labeling schemes.

68. In *Cook v. Gralike*, 531 U.S. 510 (2001), the Supreme Court struck down Missouri's "instructional ballot labels" as an impermissible attempt to impose term limits on federal candidates, holding they were "an indirect attempt to impose term limits" in violation of *Thornton*.

69. A felony conviction is not a constitutional disqualification for service in the U.S. House of Representatives.

70. Neither states nor political parties may impose such a requirement through ballot access mechanisms. See *Anderson v. Mills*, 664 F.2d 600 (6th Cir. 1981) (holding Kentucky statute imposing criminal history requirements for federal candidates unconstitutional under the Qualifications Clause).

## E. The Unconstitutional Vetting System

71. The MRSC, in conjunction with groups such as the Republican Association of Central Committees (REPACCMO), has formalized a mandatory, ideological "vetting" system that operates under the authority granted by § 115.357.2.

72. This system, detailed in the REPACCMO Vetting Manual and various forms, dictates that a candidate's filing fee will be accepted only if the candidate adheres to the party committee's subjective ideological standards.

73. The vetting criteria extend far beyond objective statutory requirements (age, residency).

11

74. The criteria include mandatory completion of an ideological Values Survey detailing a candidate's positions on policy.

75. This survey is a 25-question multiple-choice survey administered online (e.g., via Survey Monkey) in a proctored setting, with pass/fail based on a majority of answers aligning with "Republican values" as defined by the party platform (effective August 2023). No cell phones or devices are allowed during the survey.

76. The criteria include mandatory signing of a Republican Candidate Statement, affirming alignment with the party platform, including sections on duties, voting records, and equality principles. Refusal to sign disqualifies the candidate.

77. The criteria include the use of an ideological Candidate Tally Sheet incorporating external, third-party political scorecards (e.g., Americans for Prosperity (AFP), Conservative Political Action Conference (CPAC), Freedom Index, Freedom Principle) to assign a numerical score to a candidate's "alignment" or "purity."

78. For state-level candidates or legislators, a passing score requires at least 70% on three or more scorecards, plus no automatic fails from records checks.

79. Additional records checks are performed, including Case Net for felonies (automatic fail).

80. This felony check is a criterion that violates Article I, Section 2 of the U.S. Constitution when applied to candidates for U.S. Representative, as felony convictions are not among the exclusive qualifications established in *Thornton* and *Powell*.

81. This felony requirement is facially unconstitutional under *Anderson v. Mills*, 664 F.2d 600 (6th Cir. 1981).

82. Other records checks include Missouri Ethics Commission (MEC) for guilty ethics findings (automatic fail); tax records for delinquent personal or real estate taxes (automatic fail); and county audits for misuse of funds (automatic fail).

12

83. When applied to federal candidates, several of these criteria constitute impermissible additions to the constitutional qualifications for office.

84. The explicit function of this mandatory vetting is not advisory, but rather to serve as a gatekeeping function to "reject the filing fees" of candidates deemed unaligned with the MRSC's preferred viewpoint, thereby achieving complete ballot exclusion.

85. The process is standardized across counties that adopt it, with vetting subcommittees, publicized sessions, and strict cutoffs.

86. Failed candidates receive a rejection letter, and clerks are notified to prevent ballot access.

87. This system is promoted as ensuring "Platform alignment" but operates as a subjective barrier, overriding voter choice in primaries.

88. The Defendants' attempts to exclude the Plaintiff are not isolated incidents but part of a documented, statewide pattern of extra-legal gatekeeping.

89. This system has already resulted in criminal charges for election interference against party leadership in Vernon County, Missouri (*State v. Haggard*, 25VE-CR00330, Vernon County Circuit Court).

90. This system has resulted in multiple attempts to co-opt state election machinery to enforce private "vetting" surveys in Christian County, Missouri (*CCRCC v. Brumfield*, 24CT-CC00197, Christian County Circuit Court).

91. By threatening to refuse Plaintiff's filing fee based on his protected speech, the MRSC is attempting to do through "vetting" what the U.S. Constitution expressly prohibits: the imposition of unauthorized, ideological qualifications for federal office.

## F. The MRSC's Attempt to Circumvent Judicial Review

92. In February 2024, the MRSC Treasurer accepted Plaintiff's filing fee for the office of Governor, and Plaintiff was certified number one on the Republican primary ballot.

93. The MRSC's subsequent regret regarding this association created a state of cognitive dissonance between their party platform and the Plaintiff's candidacy.

94. To resolve this internal inconsistency, they filed *Missouri Republican State Committee v. Secretary of State*, Case No. 24AC-CC02151, Cole County Circuit Court, in a late-stage attempt to remove Plaintiff from the ballot.

95. On May 17, 2024, the Cole County Circuit Court (The Honorable Judge S. Cotton Walker) rejected the MRSC's claim (Judgment, May 17, 2024).

96. The court found the MRSC had waived its objection by accepting the fee, was barred by the unclean hands doctrine, and was precluded from imposing a post-filing purity test.

97. The Court specifically held that the MRSC's proper remedy was public disavowal, not ballot exclusion.

98. This judgment was upheld on appeal (Missouri Court of Appeals, Western District, July 3, 2024), confirming that once the fee is accepted, the party cannot retroactively exclude a candidate for ideological reasons.

99. The MRSC now intends to use the ideological vetting system described herein to reject Plaintiff's filing fee for the August 2026 MO-04 Congressional primary, which opens on February 24, 2026.

100. This threatened rejection is a direct and transparent attempt to achieve through pre-filing veto what the State Court prohibited through post-filing rescission, effectively circumventing the 2024 judicial judgment.

101. The MRSC's actions in 2024 demonstrate a pattern of using delegated state authority to exclude candidates based on viewpoint, and given Plaintiff's history, the vetting system will be applied to bar him.

102. On February 29, 2024, the Missouri Republican Party tweeted on X that "Darrell Leon McClanahan III filed for Governor as a Republican despite his affiliations," (posted on X, formerly Twitter, February 29, 2024) then the Missouri Republican State Committee filed suit against Plaintiff on March 21, 2024 (Case No. 24AC-CC02151).

14

103.    These actions imply Plaintiff's exclusion from future Republican ballots under vetting criteria, including this upcoming 2026 election.

## G. Irreparable Harm and Ripeness

104.    Plaintiff need not tender his filing fee and suffer certain rejection to establish ripeness.

105.    The MRSC's published vetting policy (REPACCMO Manual), prior litigation against Plaintiff (24AC-CC02151), and public statements regarding candidates with Plaintiff's public profile establish that rejection is inevitable. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) (pre-enforcement challenge ripe where credible threat of enforcement).

106.    Without the MRSC receipt, Defendant Hoskins must reject Plaintiff's candidacy under § 115.357.2.

107.    This denial of access to the dispositive primary ballot constitutes an irreparable injury, as the Republican primary in MO-04 is effectively determinative of who will represent the district in Congress.

## H. Accepted State-Party Custom and Its Constitutional Limits

108.    Missouri courts and legal opinions have established a custom whereby political parties may refuse filing fees as a means of non-association, but this power is not absolute and must comply with constitutional limits.

109.    In *Miller v. Carnahan*, 370 S.W.3d 637 (Mo. banc 2012), the Missouri Supreme Court held that political parties have the right to reject a candidate's filing fee if they do not wish to associate with the candidate, affirming the party's associational rights under the First Amendment.

110.    This precedent underscores the delegated authority under § 115.357.2 but does not authorize arbitrary or discriminatory ideological tests, and more importantly, cannot override federal constitutional qualifications for federal office.

111.    In a formal opinion dated April 9, 2010, former Cape Girardeau County Prosecuting Attorney H. Morley Swingle opined that party committees can legally refuse to accept filing fees from unwanted

15

candidates, citing statutory language and associational freedoms (Formal Opinion, April 9, 2010).

112. This opinion has been referenced in subsequent party actions and court cases (e.g., *Curtis v. Missouri Democratic Party*, No. 18SL-CC01234, St. Louis County Circuit Court, 2018) to support pre-filing rejections.

113. While these precedents affirm the custom of fee rejection as a tool for party autonomy, they do not permit the MRSC to implement a mandatory, subjective vetting system that burdens constitutional rights or adds qualifications to federal office.

114. The custom assumes objective, non-discriminatory application, not the viewpoint-based "purity test" at issue here.

115. Moreover, any party associational rights must yield to the exclusive federal qualifications established by the Qualifications Clause.

116. The tension between party associational rights and the Qualifications Clause has been addressed in *California Democratic Party v. Jones*, 530 U.S. 567 (2000), where the Supreme Court emphasized that while parties have First Amendment rights to define their message and membership, these rights operate within constitutional constraints.

117. The Supreme Court has never held that party associational rights permit circumventing the exclusive federal qualifications for congressional office.

118. While political parties possess robust First Amendment rights to define their message and manage their internal affairs, those rights are at their apex in internal party governance and at their nadir when the party performs a state-delegated gatekeeping function that determines access to a public, state-administered primary ballot.

119. When Missouri conditions ballot access for federal office on the discretionary approval of a party committee under § 115.357.2, the committee's actions are subject to full constitutional scrutiny as state action, and cannot be used to impose qualifications beyond Article I, Section 2.

16

## I. State-Delegated Gatekeeping Under § 115.357.2

120. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

121. Missouri law conditions access to the partisan primary ballot for United States Representative on the prior issuance of a receipt by the appropriate state party committee. Mo. Rev. Stat. § 115.357.2 provides, in relevant part, that a candidate "shall pay the required sum directly to the treasurer of the appropriate party committee" and that the filing officer shall not accept the candidate's declaration of candidacy unless it is accompanied by "a receipt issued by the treasurer of the committee showing that the sum has been paid."

122. For Republican candidates for the United States House of Representatives, the "appropriate party committee" under § 115.357.2 is the Missouri Republican State Committee ("MRSC"), and the required fee is three hundred dollars ($300).

123. Defendant Hoskins, as Missouri Secretary of State, is statutorily required to reject any declaration of candidacy for U.S. Representative that is not accompanied by a valid receipt from the MRSC treasurer. He has no discretion to waive this requirement.

124. By making the MRSC's receipt a mandatory statutory prerequisite to filing for federal office, Missouri has delegated to a private party committee a core public function: gatekeeping which candidates may access the primary ballot for the United States House of Representatives. When the MRSC accepts or refuses Plaintiff's filing fee in this context, it is not merely exercising private associational preference; it is performing a state-created screening function without which Defendant Hoskins is forbidden to accept Plaintiff's filing at all.

125. Accordingly, the MRSC's threatened refusal to issue Plaintiff a receipt based on extra-constitutional criteria such as ideological alignment, survey responses, or criminal-history factors constitutes state action for purposes of Article I, Section 2 and 42 U.S.C. § 1983 and operates as an unconstitutional additional qualification for federal office.

17

## IV. CAUSES OF ACTION

## COUNT I: VIOLATION OF FIRST AND FOURTEENTH AMENDMENTS (RIGHT TO SEEK OFFICE AND ASSOCIATION)

126. Plaintiff realleges and incorporates by reference paragraphs 1-125 as if fully set forth herein.

127. The MRSC's authority to use § 115.357.2 to impose an ideological vetting test constitutes state action under the public function and joint participation doctrines.

128. The power to control ballot access in a dispositive primary is a traditional state function. *Terry v. Adams*, 345 U.S. 461 (1953) (holding that private organization's control over primary election constituted state action).

129. Missouri's delegation constitutes state action under *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982), where private entities using state-created procedures for exclusion are state actors. Here, § 115.357.2 mandates the MRSC receipt as a ballot prerequisite, making rejection state-compelled.

130. The MRSC's use of ideological criteria, particularly the Tally Sheet scorecards and Values Survey, to deny the filing fee imposes a severe burden on Plaintiff's fundamental right to seek office and the associational rights of Republican voters to cast meaningful votes for the candidate of their choice. *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).

131. Under the Anderson-Burdick framework, such a severe burden must be justified by a compelling state interest and be narrowly tailored (strict scrutiny).

132. The complete exclusion from the dispositive primary ballot is the most severe burden possible on the right to seek office.

133. The state has no compelling interest in allowing a private committee to impose a subjective "ideological purity test" that operates as viewpoint discrimination.

18

134. The state's legitimate interests in ballot integrity and orderly elections are not served by ideological vetting that excludes candidates who meet all objective constitutional and statutory qualifications.

135. The MRSC's vetting system attempts to impose qualifications for federal office that are not contained in the U.S. Constitution.

136. Specifically, the automatic rejection based on felony convictions directly violates the Qualifications Clause, as criminal history is not among the three exclusive constitutional requirements for U.S. Representative. This requirement is independently unconstitutional under *Anderson v. Mills*.

137. The requirement to achieve 70% alignment scores on third-party ideological scorecards effectively creates a political ideology qualification not found in Article I, Section 2.

138. The mandatory Values Survey and platform statement requirements impose viewpoint-based qualifications that exceed constitutional boundaries.

139. States cannot constitutionally add qualifications for federal offices through any mechanism, including delegation to political parties. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 795 (1995).

140. The MRSC's enforcement of these criteria, under delegated state authority through § 115.357.2, constitutes state action that independently violates the Qualifications Clause.

141. This violation is particularly clear regarding the felony disqualification. Missouri has no authority to prohibit felons from seeking federal office, and it cannot achieve this prohibited result by delegating veto power to a private party committee.

142. The state action here is the statute requiring the MRSC receipt as a mandatory prerequisite to ballot access.

143. The Supreme Court has specifically prohibited Missouri from using ballot access mechanisms to circumvent federal qualifications. *Cook v. Gralike*, 531 U.S. 510 (2001).

19

144. The current scheme is indistinguishable in constitutional effect from the impermissible ballot labeling struck down in *Gralike* both attempt to impose additional qualifications on federal candidates through state-controlled ballot access procedures.

145. The Missouri judiciary has confirmed that this delegated power cannot be utilized as a tool for systematic, arbitrary viewpoint discrimination against otherwise qualified candidates, as evidenced by the MRSC v. Secretary of State judgment (2024).

146. The MRSC's system serves only the private interest of the committee leadership, not the state's interest in fair elections, violating the First Amendment.

## COUNT II: VIOLATION OF FOURTEENTH AMENDMENT (DUE PROCESS)

147. Plaintiff realleges and incorporates by reference paragraphs 1-146 as if fully set forth herein.

148. The statutory scheme creates a legitimate claim of entitlement to ballot access for all candidates who meet objective statutory qualifications.

149. The MRSC's use of § 115.357.2 to enforce its ideological vetting system violates Plaintiff's right to procedural due process.

150. This violation occurs by denying Plaintiff the entitlement of ballot access based on vague, subjective, and unwritten standards (the Tally Sheet scoring and Values Survey pass/fail criteria).

151. This violation occurs by denying Plaintiff adequate notice of the exact criteria required for acceptance. The vetting manual describes general processes but does not provide clear, objective standards that would allow a candidate to know in advance whether his or her filing fee will be accepted.

152. This violation occurs by providing no meaningful mechanism for appeal or review of the committee's rejection decision. Once the MRSC rejects a filing fee, there is no administrative process for reconsideration, and the filing deadline makes judicial review practically impossible.

20

153. The arbitrary denial of the filing fee receipt a mandatory state prerequisite without clear, public, and objective standards constitutes a deprivation of a protected liberty interest without due process of law.

154. The Supreme Court has held that when a state creates a legitimate claim of entitlement to a benefit, procedural due process requires notice and an opportunity to be heard before that benefit can be denied. *Board of Regents v. Roth*, 408 U.S. 564 (1972). The MRSC's vetting system provides neither.

## COUNT III: VIOLATION OF FOURTEENTH AMENDMENT (EQUAL PROTECTION)

155. Plaintiff realleges and incorporates by reference paragraphs 1-154 as if fully set forth herein.

156. The statutory scheme is unconstitutional as applied because it permits the MRSC to exercise a mandatory state function without providing standards to guide the committee's discretion.

157. This lack of standards allows the MRSC to arbitrarily and discriminatorily apply its unwritten ideological test to exclude certain candidates, while accepting others who may similarly hold dissenting viewpoints but are favored by the leadership.

158. The application of a subjective "purity test" to a select class of candidates, not applied equally to all who seek the Republican nomination, violates the Equal Protection Clause. *Yick Wo v. Hopkins*, 118 U.S. 356 (1886).

159. This arbitrary veto power denies access to a federal ballot without objective standards or due process, a practice structurally similar to the unconstitutional administrative barriers used under historical election laws.

160. The MRSC's vetting system operates analogously to Jim Crow America-era ballot restrictions that used facially neutral but arbitrarily applied standards to exclude disfavored candidates and voters.

161. Like the discriminatory literacy tests and "good character" requirements struck down in cases such as *Louisiana v. United States*, 380

21

U.S. 145 (1965), the MRSC's ideological scorecards and Values Survey vest unbridled discretion in private actors to determine ballot access based on subjective criteria.

162. Such standardless systems violate equal protection regardless of the identity of those excluded.

163. The standardless discretion afforded to the MRSC creates the opportunity for discriminatory application based on the political views of individual committee members, the factional control of the committee, or personal animus toward particular candidates.

164. Equal protection requires that similarly situated candidates be treated similarly. Here, all candidates who meet the constitutional qualifications for U.S. Representative should have equal access to the primary ballot, regardless of their positions on specific policy issues or their alignment with third-party scorecards.

## COUNT IV: VIOLATION OF ARTICLE I, SECTION 2 (QUALIFICATIONS CLAUSE)

165. Plaintiff realleges and incorporates by reference paragraphs 1-164 as if fully set forth herein.

166. Article I, Section 2, Clause 2 of the United States Constitution establishes the exclusive qualifications for U.S. Representative: age (25 years), Citizenship (seven years), and State Inhabitancy.

167. These qualifications are exclusive and cannot be supplemented by states or by private entities exercising state-delegated authority. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995); *Powell v. McCormack*, 395 U.S. 486 (1969).

168. The MRSC's vetting criteria, enforced through state-mandated filing fee receipt requirements under § 115.357.2, impose additional qualifications.

169. These additional qualifications include freedom from felony convictions.

170.    These additional qualifications include alignment with party platform as measured by third-party scorecards achieving 70% or higher scores.

171.    These additional qualifications include ideological conformity as determined by a Values Survey with answers aligning with "Republican values."

172.    These additional qualifications include willingness to sign yesa masa party loyalty pledges and candidate statements.

173.    These additional qualifications include freedom from ethics violations, tax delinquencies, or audit findings.

174.    None of these criteria are among the constitutional qualifications for U.S. Representative.

175.    By making the MRSC receipt a mandatory prerequisite to ballot access, Missouri has delegated to a private entity the power to enforce qualifications beyond those in the Constitution.

176.    This delegation does not insulate the unconstitutional requirements from judicial review. When a state delegates essential election functions to a private entity, that entity's actions constitute state action under the Fourteenth Amendment. *Terry v. Adams*, 345 U.S. 461 (1953).

177.    The felony disqualification alone independently violates the Qualifications Clause, regardless of any associational rights the MRSC might otherwise possess.

178.    The Sixth Circuit has specifically held that states cannot impose criminal history requirements on federal candidates. *Anderson v. Mills*, 664 F.2d 600 (6th Cir. 1981).

179.    Defendant Hoskins, by enforcing § 115.357.2's requirement that candidates obtain MRSC receipts before ballot certification, acts under color of state law to enforce these unconstitutional additional qualifications.

180.    This enforcement violates 42 U.S.C. § 1983 and directly contravenes the Supremacy Clause by allowing state-delegated private actors to override federal constitutional qualifications for federal office.

23

181. The practical effect of the MRSC's vetting system is to allow a private committee to determine who may seek federal office in Missouri, supplanting the People's right to vote for any constitutionally qualified candidate in the primary election.

182. The requested relief serves the public interest by preserving voter choice in Missouri's R+23 district, where the primary determines congressional representation, and enforcing uniform federal qualifications. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. at 827 (public interest in "uniform National Legislature").

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Darrell Leon McClanahan III respectfully demands judgment against the Defendants and requests the Court to:

### A. Declaratory Judgment that:

(i) Mo. Rev. Stat. § 115.357.2, as applied to allow Defendant MRSC to reject a constitutionally qualified candidate for U.S. Representative based on ideological criteria or criminal history, violates the First and Fourteenth Amendment rights of Plaintiff and MO-04 Republican voters to associate with and vote for their preferred constitutionally qualified candidate; and

(ii) Mo. Rev. Stat. § 115.357.2, as applied to permit rejection of candidates for federal office based on criteria beyond the exclusive qualifications in Article I, Section 2, violates the Qualifications Clause and the Supremacy Clause of the U.S. Constitution. 28 U.S.C. § 2201.

**B.** Permanent Injunction compelling Defendant MRSC and its Treasurer, Defendant Kinder, to accept Plaintiff's $300.00 filing fee for the August 2026 MO-04 Republican primary upon its tender on or after February 24, 2026, and to issue a valid receipt.

**C.** Permanent Injunction compelling Defendant Secretary Hoskins to accept Plaintiff's Declaration of Candidacy and certify Plaintiff for the August 2026 MO-04 Republican primary, provided Plaintiff submits the fee receipt and meets all other objective constitutional qualifications. 28 U.S.C. § 2202; Fed. R. Civ. P. 65.

24

**D.** Award Plaintiff costs and attorneys' fees under 42 U.S.C. § 1988(b).

**E.** Grant Plaintiff such other and further relief as the Court deems just and equitable.

**F.** Preliminary and permanent injunctive relief enjoining Defendants from enforcing ideological vetting requirements, criminal history disqualifications, or third-party scorecard criteria as prerequisites to accepting Plaintiff's filing fee or certifying his candidacy for the August 2026 MO-04 Republican primary, pursuant to Fed. R. Civ. P. 65(a).

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted in the interest of justice, December 23, 2025.

**Darrell Leon McClanahan III, Pro Se**
24346 S. 2425 Rd.
Milo, MO 64767
darrell4mogov@gmail.com

## VERIFICATION

I, Darrell Leon McClanahan III, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I am the Plaintiff in the above-entitled action; that I have read the foregoing Complaint for Declaratory and Injunctive Relief and know the contents thereof; that the same is true of my own knowledge, except as to those matters which are therein stated on information and belief, and as to those matters, I believe them to be true.

Executed on December 23, 2025, at Milo, Missouri.

25

**Darrell Leon McClanahan III, Pro Se**
24346 S. 2425 Rd.
Milo, MO 64767
darrell4mogov@gmail.com

## LIST OF EXHIBITS

26